# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RAYBORN J. DURAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16cv86 |
| | ) | |
| ANTHONY G. CHARLES, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on Plaintiff's "Motion for Summary Judgement" (Docket Entry 29) (the "Summary Judgment Motion"). For the reasons that follow, the Court should deny the Summary Judgment Motion.

## BACKGROUND

Pursuant to 42 U.S.C. § 1983, Rayborn J. Durand (the "Plaintiff") commenced this action against Anthony G. Charles, M.D. (the "Defendant") for acts and/or omissions amounting to deliberate indifference to Plaintiff's serious medical needs during Plaintiff's pretrial detention by the North Carolina Department of Public Safety (the "DPS"). (Docket Entry 2 (the "Complaint") at 3-6.)[1] Defendant initially moved to dismiss the Complaint pursuant to "Rule 12(b)(6) of the Federal Rules of Civil Procedure" (the

---

[1] Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

"Rules"). (Docket Entry 12 at 1.) As, however, "construed in the light most favorable to Plaintiff and taking all reasonable inferences in his favor, the Complaint alleges that Defendant knowingly failed to treat his obvious, serious medical need, which required prompt surgical intervention" (Docket Entry 22 at 17), the undersigned concluded that the Complaint "establish[ed] a claim for deliberate indifference sufficient to withstand Rule 12(b)(6) dismissal" (id. at 15). The undersigned therefore recommended denial of Defendant's dismissal motion. (See id. at 22.) The Court (per United States District Judge Loretta C. Biggs) adopted that recommendation. (See Docket Entry 25 at 1.) Thereafter, the parties commenced discovery. (See Text Order dated Jan. 30, 2017 (authorizing discovery).) Less than halfway through the discovery period (see id. (establishing discovery deadline of July 31, 2017)), Plaintiff moved for summary judgment (see Docket Entry 29), which Defendant opposes (see Docket Entry 30).[2]

---

2 Weeks after his deadline, Plaintiff sought "an extension of time to answer Defendant[']s Response in Opposition of Plaintiff[']s Motion for Summary Judgement" until after he obtained further discovery, including the deposition of "Plaintiff[']s wi[tn]ess Mr. Kurian PA-C." (Docket Entry 33 at 1.) The Court (per the undersigned) denied that request because, among other reasons, "Plaintiff ha[d] not explained why he need[ed] additional material to support [the Summary Judgment] Motion, when he knew he did not have such material at the time he filed [the Summary Judgment] Motion." (Text Order dated June 7, 2017.)

2

**DISCUSSION**

**I. Summary Judgment Standards**

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v.

Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

## II. Plaintiff's Allegations

In his unverified Complaint, Plaintiff alleges that:

He "was diagnosed with a right inguinal hernia" during his pretrial detention at the DPS's Craven Correctional Institution (the "Craven C.I."). (Docket Entry 2 at 4.)[3] Defendant performed "a right inguinal hernia repair with mesh" on Plaintiff "at the U.N.C. Medical Center at Chapel Hill" (the "U.N.C.M.C.") on February 1, 2013. (Id.) "In the next days[, Plaintiff's] right scrotum became swollen and painful," causing his return to the U.N.C.M.C. on February 7, 2013, at which point Defendant "excised a retained distal sac sized 6.8 cm x 3.7 x 2.5 cm." (Id.) Following this surgery, Plaintiff "was taken to Central Prison" (the "C.P.") and "admitted to the C.P. Hospital acute care ward." (Id.) Plaintiff "developed a painful swollen hardened mass surrounding his right testicle" and, at an appointment at U.N.C.M.C. on February 19, 2013, "was instructed to take ibuprofen for pain and to elevate and ice his scrotum for swelling and was discharged from [Defendant's] care." (Id.)

---

3 As relevant to this matter, an "inguinal hernia" involves the protrusion of the intestine into the canal "through which the testis descends into the scrotum and in which lies the spermatic cord." (Docket Entry 22 at 2 n.1 (internal quotation marks omitted).)

4

On February 21, 2013, an ultrasound technician conducted an ultrasound of Plaintiff's scrotum at the C.P. Hospital. (Id.) The ultrasound technician informed Physician Assistant Kurian ("P.A. Kurian"), Plaintiff's C.P. Hospital "care provider," that the ultrasound "revealed decreased to no blood flow to [Plaintiff's] right testicle." (Id.) "P.A. Kurian emergently contacted [Defendant] who when told of the [ultrasound] finding stated that he was already aware that the blood supply to [Plaintiff's] testicle was diminished and there was a good chance [Plaintiff] would lose his testicle. [Defendant] counseled P.A. Kurian against tak[i]ng any further action." (Id. at 5.) Thereafter, P.A. Kurian informed Plaintiff "of the [ultrasound] result and of the impending possible loss of his testicle," and "told [him] that no further action would be taken at [Defendant's] recommendation." (Id.)

"That evening, . . . Dr. Tharrington, a radiologist who had just read [Plaintiff's ultrasound] results," called "Dr. Bowen of the C.P. Hospital emergency dep[artment]." (Id.) Dr. Tharrington told Dr. Bowen "that immediate emergency surgical consultation and followup was urged concerning the lack of testicular blood flow." (Id.) On the morning of February 22, 2013, Plaintiff underwent exploratory surgery by Dr. Gorden Fifer at the U.N.C.M.C., which "revealed a necrotic right testicle which was removed." (Id.) On March 25, 2013, Plaintiff "was released from Dr. Fifer's care and

was also released from the C.P. Hospital and returned to Craven C.I." (Id.)

"[T]he lack of or decreased blood flow to [Plaintiff's] testicle, which was foreknown by [Defendant] before the [ultrasound,] was a serious medical need requir[i]ng treatment." (Id. at 6.) Defendant "was deliberately indifferent to this serious medical need by failing to initiate action when he first knew of the lack of or decreased blood flow and possible impending loss of [Plaintiff's] testicle and by counseling against tak[i]ng any preventative action to prevent its loss." (Id.) "This deliberate indifference resulted in a significant injury to [Plaintiff], the loss of his testicle, the importance of which is compounded by the fact that [Plaintiff] is incarcerated." (Id.) This conduct violated Plaintiff's "right to due process as . . . a pretrial detainee," for which violation, Plaintiff "seek[s] compensatory and punitive damages, costs of this action[,] and any other relief the [C]ourt deems just and proper." (Id.)

To support his allegations, Plaintiff proffers medical records from his DPS file. (See Docket Entry 26 at 1-2; see also id. at 9-11.) Specifically, Plaintiff presents two pages of DPS Provider Progress Notes (id. at 9-10) as well as Dr. Tharrington's report regarding the ultrasound (id. at 11). Written by P.A. Kurian, the first page of Provider Progress Notes contains entries dated at

6

11:30 and 17:30 on February 21, 2013. (See id. at 9.) The latter entry states:

> [Plaintiff] had ultrasound of his scrotum this afternoon and found to have ↓ed [sic] to no blood supply to his [right] testicle. His surgeon at UNC was emergently contacted [Defendant]. I talked to [Defendant] and he said that they were aware that the blood supply to the [right] testicle was diminished and there was a good chance that [Plaintiff] may loose [sic] the [right] testicle. In light of cirrhosis this was explained to [Plaintiff]. [Defendant] said there was no need to surgically remove the testicle and said testicle will atrophy. Since [Plaintiff] is not symptomatic and is in great pain will observe and treat conditions conservatively. . . . Situation also explained to [Plaintiff] and he understands. . . .

(Id.)

Written by an unknown individual,[4] the second page of Provider Progress Notes contains five entries dated from 20:20 to 21:45 on February 21, 2013. (See id. at 10.) The initial two entries, at 20:20 and 20:40, possess the most pertinence for the Summary Judgment Motion. These entries state, respectively:

> ~~call~~ reviewed records. [Plaintiff] ć [sic] [right] testicular torsum per Dr Tharrington [illegible] Radiologist came to send [Plaintiff] out to UNC however chart reviewed c [sic] states [Plaintiff] and team already aware of low blood flow to testicle. . . . .
>
> ~~Spoke wit~~ paged Dr Qureshi at UNC surgery. states urological problem. call urology. [Defendant] didn't believe torsum earlier but thought ischemia. states

---

4 A marked difference in handwriting exists between the first and second pages of these notes. (Compare id., with id. at 10.) Unlike the entries on the first page (see id. at 9), the entries on the second page lack an identifying signature (see id. at 10).

7

urological emergency states send [Plaintiff] out.  Note prior ? [sic] confusion and [ambiguities]. . . .

(Id.)[5]

In light of these medical records, "Plaintiff asserts that he has proven his Civil Rights claim and that there are no genuine issues as to any material fact that would keep Summary Judgement from being awarded to him."  (Docket Entry 29 at 4.)

### III.  Defendant's Response

Conversely, Defendant maintains that "Plaintiff's [Summary Judgment Motion] should be denied because there is a genuine issue as to whether [Defendant] was even informed of Plaintiff's condition."  (Docket Entry 30 at 7 (all-cap font omitted).)  In support of this assertion, Defendant submitted an affidavit as well as certain of Plaintiff's UNC Health Care medical records.  (See Docket Entry 30-1.)  In pertinent part, Defendant's affidavit states:

> 4.  I understand that there is a medical record entry in [Plaintiff's] possession where Physician Assistant Kurian ("[P.A.] Kurian"), who appears to have been a physician assistant at Central Prison at the time, charted that he spoke with me on February 21, 2013.  This note states that [P.A.] Kurian called me and advised me of an ultrasound showing low blood supply to [Plaintiff's] testicle.  The note further claims that I told [P.A.] Kurian that we were aware of the decreased blood supply and that there was nothing to be done.

---

5    "Ischemia" means "localized tissue anemia due to obstruction of the inflow of arterial blood."  Ischemia, Merriam-Webster Unabridged Dictionary, http://unabridged.merriam-webster.com/unabridged/ischemia (last visited June 20, 2017).

8

> 5. This February 21, 2013 note from [P.A.] Kurian cannot be correct. I do not recall speaking with [P.A.] Kurian on that date, and I do not believe that I did speak with him. There is no entry in [Plaintiff's] chart from me regarding such a conversation, and if one had occurred I would have charted it. Also, I would never advise a physician assistant that nothing should be done in such a situation.
>
> 6. Moreover, there are two phone message notes in [Plaintiff's] medical records from UNC Health Care that suggest that [P.A.] Kurian's February 21, 2013 note must have been mistaken.
>
> 7. There is a note from Dr. Cory Forbach (attached here to as Exhibit 1) noting that he received a call on February 21, 2013 at 15:23 from [P.A.] Kurian. Dr. Forbach charted that he was told by [P.A.] Kurian that [Plaintiff] had an ultrasound performed that was potentially concerning for testicular torsion. Dr. Forbach then informed [P.A.] Kurian to have [Plaintiff] sent to the nearest emergency department.
>
> 8. UNC Health Care's medical records also contain a note from a Nurse Practitioner Megan Randall noting that she received a page from [P.A.] Kurian on February 21, 2013 at 16:42 (attached hereto as Exhibit 2). Ms. Randall noted that she received no answer when she tried to return the page, but that if [P.A.] Kurian called back he was to be directed to go to the nearest emergency department.
>
> 9. Based on these notes, and based on my memory, I do not believe that I spoke with [P.A.] Kurian on February 21, 2013 as he charted in [Plaintiff's] medical records, and I know that I did not inform [P.A.] Kurian to take no action as he charted in [Plaintiff's] medical records.

(Id. at 2-3.) Based on this affidavit and its supporting exhibits, Defendant contends, a genuine issue of material fact exists regarding whether P.A. Kurian spoke with Defendant on February 21, 2013, precluding summary judgment in Plaintiff's favor. (See Docket Entry 30 at 8.)

9

As a final matter, Defendant avers that Dr. Isserlin, rather than Defendant, treated Plaintiff on February 19, 2013. (See Docket Entry 30-1 at 3-4.) Defendant submitted treatment notes by Dr. Isserlin to corroborate this assertion. (See id. at 12-13.)

**IV. Analysis**

Plaintiff asserts that Defendant displayed deliberate indifference to his "serious medical need by failing to initiate action when he first knew of the lack of or decreased blood flow and possible impending loss of [Plaintiff's] testicle and by counseling against tak[i]ng any preventative action to prevent its loss." (Docket Entry 2 at 6.) To succeed on his claim, Plaintiff must establish that Defendant "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).[6] "To prove deliberate

---

6 Because Plaintiff qualified as a North Carolina pretrial detainee at all pertinent times, his claim arises under the Due Process Clause of the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 (1979); see also Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001) ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the [D]ue [P]rocess [C]lause."). The same analysis appears to apply to Section 1983 deliberate indifference claims under the Fourteenth Amendment as under the Eighth Amendment. See Duff v. Potter, No. 1:15-cv-26, 2016 WL 1615684, at *5 & n.4 (W.D.N.C. Apr. 22, 2016) (noting that "[t]he Supreme Court in Kingsley[ v. Hendrickson, __ U.S. __, 135 S. Ct. 2466 (2015),] did not explicitly extend the objective reasonableness standard for excessive force claims to other claims brought by pretrial detainees, including deliberate indifference claims"), aff'd in part, vacated in part, remanded on

10

indifference, [P]laintiff[] must show that '[Defendant] kn[ew] of and disregard[ed] an excessive risk to [his] health or safety.'" <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016) (fourth and fifth sets of brackets in original) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)).

Multiple avenues exist for proving deliberate indifference to a serious medical need. See, e.g., id. at 226 (explaining that a plaintiff can establish deliberate indifference by showing "that a [defendant] knew of a substantial risk from the very fact that the risk was obvious" or that "a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it" (internal quotation marks omitted; final set of brackets and ellipsis in original)). Under any approach, though, deliberate indifference "requires that [the defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." <u>De'lonta v. Johnson</u>, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted).

---

other grounds, 665 F. App'x 242 (4th Cir. 2016); but see <u>Kinder v. Merced Cty.</u>, No. 1:16-cv-1311, 2016 WL 5341254, at *3-4 (E.D. Cal. Sept. 22, 2016) (applying <u>Kingsley</u> objective reasonableness standard to pretrial detainee's deliberate indifference claim).

11

Here, Plaintiff submitted evidence suggesting (i) that Defendant possessed knowledge of the decreased testicular bloodflow, (ii) that P.A. Kurian spoke with Defendant on February 21, 2013, and (iii) that Defendant instructed P.A. Kurian not to take action regarding the decreased bloodflow to Plaintiff's testicle. (See Docket Entry 26 at 9-10.) Defendant, however, submitted evidence suggesting (i) that he did not treat Plaintiff on February 19, 2013 (see Docket Entry 30-1 at 3-4, 12-13), (ii) that P.A. Kurian did not speak with him on February 21, 2013 (see id. at 3, 8), and (iii) that UNC medical personnel did not tell P.A. Kurian to take no action regarding Plaintiff's medical situation (see id. at 3, 8, 10). Thus, construing the evidence in the light most favorable to Defendant, a reasonable jury could conclude that Defendant did not (i) treat Plaintiff on February 19, 2013, (ii) speak with C.P. medical personnel on February 21, 2013, or (iii) possess knowledge of Plaintiff's decreased testicular bloodflow. Accordingly, a material factual dispute exists regarding whether Defendant "actually kn[e]w of" the decreased bloodflow to Plaintiff's testicle (as well as whether Defendant disregarded such medical need). De'lonta, 708 F.3d at 525 (internal quotation marks omitted). Under these circumstances, summary judgment remains improper. See Evans, 80 F.3d at 959.

**CONCLUSION**

Plaintiff has not shown entitlement to judgment as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 29) be denied.

This 20th day of June, 2017.

                                        /s/ L. Patrick Auld
                                            **L. Patrick Auld**
                                    **United States Magistrate Judge**