**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
RAYBORN J. DURAND,               )
                                 )
              Plaintiff,         )
                                 )
         v.                      )        1:16cv86
                                 )
ANTHONY G. CHARLES, M.D.,        )
                                 )
              Defendant.         )
```

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant's Motion for Summary Judgment" (Docket Entry 43) (the "Summary Judgment Motion").[1] For the reasons that follow, the Court should grant the Summary Judgment Motion.

**BACKGROUND**

**I.  Procedural History**

Pursuant to 42 U.S.C. § 1983, Rayborn J. Durand (the "Plaintiff") commenced this action against Anthony G. Charles, M.D. (the "Defendant") for acts and/or omissions amounting to deliberate indifference to Plaintiff's serious medical needs during Plaintiff's pretrial detention by the North Carolina Department of Public Safety (the "DPS").  (Docket Entry 2 (the "Complaint") at 3-

---

[1] For legibility reasons, this Opinion omits all-cap font in quotations from the parties' materials.

6.)[2] Defendant initially moved to dismiss the Complaint "pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure" (the "Rules"). (Docket Entry 12 at 1.) As, however, "construed in the light most favorable to Plaintiff and taking all reasonable inferences in his favor, the Complaint alleges that Defendant knowingly failed to treat his obvious, serious medical need, which required prompt surgical intervention" (Docket Entry 22 at 17), the undersigned concluded that the Complaint "establish[ed] a claim for deliberate indifference sufficient to withstand Rule 12(b)(6) dismissal" (id. at 15). The undersigned therefore recommended denial of Defendant's dismissal motion. (See id. at 22.) The Court (per United States District Judge Loretta C. Biggs) adopted that recommendation. (See Docket Entry 25 at 1.)

Thereafter, the parties commenced discovery. (See Text Order dated Jan. 30, 2017 (authorizing discovery).) Less than halfway through the discovery period (see id. (establishing discovery deadline of July 31, 2017)), Plaintiff moved for summary judgment (see Docket Entry 29), which Defendant opposed (see Docket Entry 30). Finding that "a material factual dispute exists regarding whether Defendant 'actually kn[e]w of' the decreased bloodflow to Plaintiff's testicle (as well as whether Defendant disregarded such medical need)" (Docket Entry 34 at 12 (quoting De'lonta v. Johnson,

_____

2  Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

2

708 F.3d 520, 525 (4th Cir. 2013))), the Court denied Plaintiff's summary judgment request (see Docket Entry 38 at 1). After discovery closed, Defendant filed his Summary Judgment Motion (see Docket Entry 43 at 2-3), in response to which Plaintiff filed both a "Response in Opposition to Defendants Motion for Summary Judgement" (Docket Entry 52) (the "Response") and an unauthorized surreply, entitled "Plaintiffs Response to Defendants Reply" (Docket Entry 54) (the "Surreply").[3]

## II. Factual History

As relevant to the Summary Judgment Motion, the record reflects the following:

## A. Plaintiff's Allegations

In his unverified Complaint, Plaintiff alleges that:

During his pretrial detention at the DPS's Craven Correctional Institution (the "Craven C.I."), he "was diagnosed with a right inguinal hernia." (Docket Entry 2 at 4.)[4] On February 1, 2013,

---

3  "If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum . . . within seven (7) days addressing only the evidentiary objection." M.D.N.C. LR 7.6. Plaintiff's Surreply does not appear to meet that criteria. (See Docket Entry 54 at 2-5 (detailing three alleged "material issues in dispute").) However, Defendant did not object to the Surreply (see Docket Entries dated Nov. 29, 2017, to present), consideration of which does not affect resolution of the Summary Judgment Motion.

4  "As relevant to this matter, an inguinal hernia involves the protrusion of the intestine into the canal through which the testis descends into the scrotum and in which lies the spermatic cord." (Docket Entry 34 at 4 n.3 (internal quotation marks omitted).)

Defendant performed "a right inguinal hernia repair with mesh" on Plaintiff "at the U.N.C. Medical Center at Chapel Hill" (the "U.N.C.M.C."). (Id.) "In the next days[, Plaintiff's] right scrotum became swollen and painful," prompting his return on February 7, 2013, to the U.N.C.M.C., "where an exploration by [Defendant] excised a retained distal sac sized 6.8 cm x 3.7 x 2.5 cm." (Id.) Following this surgery, Plaintiff "was taken to Central Prison" (the "C.P.") and "admitted to the C.P. Hospital acute care ward." (Id.) Plaintiff "developed a painful swollen hardened mass surrounding his right testicle" and, at a U.N.C.M.C. appointment on February 19, 2013, "was instructed to take ibuprofen for pain and to elevate and ice his scrotum for swelling and was discharged from [Defendant's] care." (Id.)

On February 21, 2013, an ultrasound technician conducted an ultrasound of Plaintiff's scrotum at the C.P. Hospital. (Id.) The ultrasound technician informed Physician Assistant Kurian ("P.A. Kurian"), Plaintiff's C.P. Hospital "care provider," that the ultrasound "revealed decreased to no blood flow to [Plaintiff's] right testicle." (Id.) "P.A. Kurian emergently contacted [Defendant] who when told of the [ultrasound] finding stated that he was already aware that the blood supply to [Plaintiff's] testicle was diminished and there was a good chance [Plaintiff] would lose his testicle. [Defendant] counseled P.A. Kurian against tak[i]ng any further action." (Id. at 5.) Thereafter, P.A. Kurian

informed Plaintiff "of the [ultrasound] result and of the impending possible loss of his testicle," and "told [him] that no further action would be taken at [Defendant's] recommendation." (Id.)

"That evening, . . . Dr. Tharrington, a radiologist who had just read [Plaintiff's ultrasound] results," contacted "Dr. Bowen of the C.P. Hospital emergency dep[artment]." (Id.) Dr. Tharrington told Dr. Bowen "that immediate emergency surgical consultation and followup was urged concerning the lack of testicular blood flow." (Id.) "[Plaintiff] was again taken to the U.N.C.M.C.[,] where," on the morning of February 22, 2013, Dr. Gorden Fifer conducted exploratory surgery, which "revealed a necrotic right testicle which was removed." (Id.) On March 25, 2013, Plaintiff "was released from Dr. Fifer's care and was also released from the C.P. Hospital and returned to Craven C.I." (Id.)

"[T]he lack of or decreased blood flow to [Plaintiff's] testicle, which was foreknown by [Defendant] before the [ultrasound,] was a serious medical need requir[i]ng treatment." (Id. at 6.) Defendant "was deliberately indifferent to this serious medical need by failing to initiate action when he first knew of the lack of or decreased blood flow and possible impending loss of [Plaintiff's] testicle and by counseling against tak[i]ng any preventative action to prevent its loss." (Id.) "This deliberate indifference resulted in a significant injury to [Plaintiff], the loss of his testicle, the importance of which is

compounded by the fact that [Plaintiff] is incarcerated." (Id.)
This conduct "violated [Plaintiff's] right to due process as . . .
a pretrial detainee," for which violation, Plaintiff "seek[s]
compensatory and punitive damages, costs of this action[,] and any
other relief the [C]ourt deems just and proper." (Id.)

### B. U.N.C.M.C. Records

In regard to these allegations, the parties submitted various
U.N.C.M.C. medical records from January and February of 2013, which
reflect the following:

On January 3, 2013, Defendant examined Plaintiff regarding an
"inguinal hernia of several months' duration that has been
reducible" (Docket Entry 44-1 at 1), but which "has had increasing
pain and irritations" (id. at 2). "[They] discussed the risks and
benefits of the procedure doing a right open hernia repair with
mesh." (Id.) "[Plaintiff] expressed that he understood the risks
and benefits and would like to proceed with the procedure," which
"ha[d] been scheduled for [February 1, 2013]." (Id.)

On February 1, 2013, Defendant participated in a surgery on
Plaintiff's "right inguinal hernia" (id. at 4). (See id. at 3-5.)
Five days later, Plaintiff "presented back to the Emergency Room
complaining of bilateral groin pain." (Id. at 6.) An
"[u]ltrasound was done that reportedly was described as having a
recurrent hernia," prompting a CT scan. (Id.) The CT scan "was
misread as a recurrent hernia, but later corrected, but based on

his initial report it was decided to bring him to the operating room for an exploration of his groin" on February 7, 2013. (Id. at 6-7.) Defendant participated in this operation (see id.), in which (1) the spermatic cord "was found to be viable," (2) "[t]he floor of the inguinal canal was inspected and the mesh was found to be well attached and viable," and (3) "[t]here was no evidence of any recurrent hernia." (Id. at 7.) "The distal portion of the spermatic cord was then inspected and, using blunt dissection, the distal hernia sac was then brought into the wound. A small amount of ornentum was found in it and this was removed. Some of the sac was then excised." (Id.) "The resulting wound was then copiously irrigated with normal saline solution" and closed. (Id.)

On February 19, 2013, Plaintiff received "an urgent evaluation" at the U.N.C.M.C. because "[h]is physician in the prison was recently concerned that he had recurred." (Docket Entry 44-4 at 1.) Dr. Benjamin Isserlin conducted this examination (see id. at 1-2), during which Plaintiff "[wa]s sitting in no apparent distress" (id. at 1). According to Dr. Isserlin,

> [f]ocused examination of the abdomen and groin reveal a
> well-healed right inguinal hernia repair incision,
> without any evidence of infection or leakage. There
> [wa]s a significant amount of swelling through the cord
> and into the right scrotum. The right scrotum itself
> [wa]s quite swollen and indurated without any evidence of
> bruising or hematoma. [Dr. Isserlin was] unable to
> palpate the right testicle. On Valsalva, the hernia
> repair [wa]s intact, without any evidence of recurrence.
> The remainder of the physical examination [wa]s
> unremarkable.

(Id. at 1-2.) Dr. Isserlin "informed [Plaintiff] that there [wa]s no obvious evidence of hernia recurrence and that his repair appear[ed] to be intact." (Id. at 2.) Dr. Isserlin noted that Plaintiff was "certainly having a significant degree of swelling, although [Dr. Isserlin] suspect[ed] this [wa]s likely due to the dissection of the distal sac. [Dr. Isserlin] advised him to continue with icing and elevation of the scrotum and to continue with NSAIDs for his discomfort." (Id.) Plaintiff told Dr. Isserlin "that there [wa]s an ultrasound scheduled" for an unknown future date, which Dr. Isserlin subsequently learned was February 22, 2013. (Id.) U.N.C.M.C. "asked that a copy of the [ultrasound] report be sent to [it] and [indicated] that [U.N.C.M.C.] will see [Plaintiff] in followup on a[n as-needed] basis, should there be any concerns with that ultrasound." (Id.)

On February 21, 2013, Dr. Cory Forbach received a call from P.A. Kurian as to a "concern for testicular torsion" regarding Plaintiff. (Docket Entry 44-11 at 1.)[5] The message lists the "Call-in Time" as 15:23:36 and states as the "Reason for Call" that "Dr. Kurian (sp?) called from Central Prison because this patient had an ultrasound today that was reportedly concerning for testicular torsion. Because [Plaintiff] had an R inguinal hernia

_____

5    The U.N.C.M.C. "Phone Messages" records identify the relevant "Author" without specifying such person's job title. (See id. at 1-2.) Defendant's affidavit identifies these individuals' job titles: "Dr. Cory Forbach" (Docket Entry 44-3, ¶ 8) and "Nurse Practitioner Megan Randall" (id., ¶ 9).

8

repair on 2/7, the prison physician wanted [Dr. Forbach] to authorize an admission/transfer from the prison." (Id.) Dr. Forbach

> explained that, while [Dr. Forbach} agree[d] that testicular torsion [wa]s a surgical emergency, [P.A. Kurian] need[ed] to call the transfer center and have the patient sent to the Emergency Department as per protocol for emergent urologic evaluation and management. [Dr. Forbach] did not understand exactly what was [P.A. Kurian's] reluctance to speaking with the transfer center, but [Dr. Forbach] explained 2-3 times that testicular torsion [wa]s a urologic emergency and that he must get the patient ASAP to the UNC ED via the transfer center. [P.A. Kurian] acknowledged that he understood and planned to call the transfer center immediately after [they] ended [their] conversation.

(Id.) However, a U.N.C.M.C. "Phone Message[]" by Nurse Practitioner Megan Randall with a "Call-in Time" of 16:42:04 on February 21, 2013, states:

> paged with a message to call Dr. Kurian at 919-743-3977 at Craven Correctional Facility for "decreased blood flow to the surgical area." There is no answer at this # nor at the # listed for him at 252-244-3337. If he calls back, he should be directed to the nearest ED.

(Id. at 2.)[6]

At 21:50 on February 21, 2013, the U.N.C.M.C. emergency department received a "[r]eport from Central Prison" regarding Plaintiff, who had "ongoing R testicular pain since his R inguinal

---

6 As Plaintiff emphasizes (see Docket Entry 52 at 8 ("[T]he computer generated time stamp on this call log is finished before it starts.")), this message states that it was "[c]losed by" Nurse Practitioner Randall at "16:33:01.301301" (Docket Entry 44-11 at 2). In turn, the first message indicates that it was "[c]losed by" Dr. Forbach at "15:29:07.316551." (Id. at 1.)

hernia repair on 2/813 [sic] today had U/S done concerned for R testicular torsion [Plaintiff] sent to UNC for further evaluation by Urology. [Plaintiff] given Oxycodone lOmg po at 2105 . . . ." (Docket Entry 44-5 at 5.) Plaintiff arrived at the U.N.C.M.C. emergency department at 22:56 on February 21, 2013, where a nurse began evaluating him at 22:59. (Id.) Triage notes indicate that Plaintiff experienced "R testicular pain since his hernia surgery on 2/1/13 described as squeezing pain s/p U/S today concerned for decreased blood flow r/o Torsion" (id. at 5-6), but that his "[p]ain level now" equaled "0/10" (id. at 6). Meanwhile, the Emergency Department doctor's "History of Present Illness" describes Plaintiff's "Chief Complaint" as "right testicular pain and swelling. This started 2/1/13 and is still present. It was gradual in onset. At its maximum, severity described as severe. When seen in the E.D., severity described as moderate." (Id. at 1.) A physical examination revealed "[m]oderate right-sided scrotal swelling with tenderness. No induration, erythema, fluctuance or ulceration. Mild tenderness of the right testicle." (Id. at 2.)

U.N.C.M.C. personnel also conducted a scrotal sonogram, which revealed abnormal arterial blood flow, abnormal venous blood flow, and abnormal testis. (Id.) More specifically, "[n]o blood flow was identified in the right testis," and "[t]here was diffuse scrotal wall thickening/edema, right greater than left, with

increased blood flow in the right scrotal wall." (Id. at 2-3.) "A comparison with prior studies reveals that the findings are new." (Id. at 3.) Following a urology "[c]onsultation performed in ED" (id. at 5), Plaintiff was "[a]dmitted to Urology and Operating room" (id.) shortly after 4 a.m. on February 22, 2013 (see id. at 7).

Dr. Fifer then conducted a "[s]crotal exploration with right orchiectomy" for Plaintiff's "[i]schemic right testicle." (Docket Entry 44-1 at 9.) Dr. Fifer's report regarding the surgery provides the following "Indications for Surgery:"

> The patient is a 47-year-old white male prisoner who at the beginning of the month underwent a right inguinal hernia repair and about a week later was complaining of scrotal swelling and pain. An ultrasound and CT scan were performed, which suggested failure of the hernia repair. He underwent repeat exploration, which showed intact hernia repair with a small remnant of hernia sac containing omenturn, which was excised at that time. Ultrasound did show good flow to the testes at that time. By history, the patient reports he was having continued severe scrotal and inguinal pain following that procedure for several days, but has actually since diminished. He had a routinely scheduled ultrasound performed at the prison yesterday, which was suggestive of compromise of blood flow to the testis. The patient was transferred to the UNC Emergency Department where a repeat ultrasound was performed, which did confirm absence of blood flow to the testicle. We discussed surgical exploration with the patient with possible orchiopexy versus orchiectomy and, after discussion of the risks and benefits of the procedure, the patient wished to proceed.

(Id. at 9-10.)

Dr. Fifer's "Operative Findings" include "1) Ischemic right testis with necrosis visible in epididymis; 2) dense inflammatory

rind surrounding entire spermatic cord with compressive effect; [and] 3) no evidence of testicular torsion or spermatic cord torsion[.]" (Id. at 10.)  In regard to the procedure, Dr. Fifer reported:

> We did note significant scrotal wall edema. . . . Using blunt finger dissection, we were able to free up some inflammatory attachments around the testis circumferentially. . . . Using blunt dissection, we continued to free the spermatic cord, which was remarkably thickened and also covered by a very thick inflammatory rind as well. We carried this up past the level of the pubic tubercle where we did believe we could palpate mesh covered by a layer of inflammatory tissue as well. With the cord mobilized, we used the Doppler ultrasound probe to try to establish any blood flow, but were not able to pick up any waveforms whatsoever. . . .
>
> We then dissected the inflammatory rind off of the spermatic cord to see if we could relieve compression and repeated Doppler which again failed to pick up any waveform suggestive of either venous or arterial flow.
>
> At this point, we felt that this testis was not salvageable and made the decision to excise it. . . .

(Id.)

### C.  DPS Records

In regard to Plaintiff's allegations, the parties also submitted certain of Plaintiff's DPS medical records.

To begin with, Plaintiff submitted DPS "Chronological Record of Health Care Inpatient/Outpatient Notes" from February 1, 2013, and February 2, 2013.  (Docket Entry 52-1 at 2.)  The first set of notes references Plaintiff's scheduled surgical appointment at U.N.C.M.C. and his return "from UNC Hosp" that evening following his surgery.  (Id.)  The entry dated "2-2-13 2015" indicates that

12

Plaintiff "walked to medical from Albemarle B Block" to report "postop pain," specifically "minimal pain (mostly pain near surgical site)," at which time his "[right] testicle [was] noted to be larger than [left] testicle." (Id.) Written in a different handwriting below that entry, an additional note states that "[Plaintiff was] declared medical emergency for increased op site pain" and was "brought to medical by custody." (Id.) At that time, Plaintiff indicated his pain equaled "7-8 on a 1-10 scale," but "[n]o grimacing [was] noted on [his] face [and he] ambulate[d] without difficulty." (Id.)

Plaintiff also submitted DPS Provider Progress Notes by Dr. James Engleman. On February 4, 2013, Dr. Engleman noted that the "Post op site is good" but that "significant edema is likely ∂ [sic] to just fluid shifts ∂ [sic] to his cirrhosis and it is unclear how much IVF he got . . . plus the long ride home." (Docket Entry 52-2 at 2.) On February 6, 2013, Dr. Engleman noted increased scrotal size, with the "scrotum now cantelope size[,] edema of scrotal wall[,] and intrascrotal fluid." (Id. (emphasis in original).) Dr. Engleman also noted that it "is full and tender throughout [right] pubic [illegible]." (Id.) These developments prompted Dr. Engleman to send Plaintiff back to U.N.C.M.C. (See id. at 3.)

Plaintiff and Defendant both submitted Plaintiff's DPS Provider Progress Notes from February 21, 2013. (See, e.g., Docket

Entries 44-2, 52-3.)  Written by P.A. Kurian, the first page of

Provider Progress Notes contains entries dated at 11:30 and 17:30

on February 21, 2013.  (<u>See</u> Docket Entry 44-2 at 1.)  The first

entry notes a solid mass, "probably solidified fluid," in the right

"scrotal/inguinal area," and states that an ultrasound will "be

done on 2/22/13 to R/O hernia recurrence."  (<u>Id.</u>)  The subsequent

entry states:

> [Plaintiff] had ultrasound of his scrotum this
> afternoon and found to have [decreased] to no blood
> supply to his [right] testicle.  His surgeon at UNC was
> emergently contacted [Defendant].   I talked to
> [Defendant] and he said that they were aware that the
> blood supply to the [right] testicle was diminished and
> there was a good chance that [Plaintiff] may loose [<u>sic</u>]
> the [right] testicle.  In light of cirrhosis this was
> explained to [Plaintiff].  [Defendant] said there was no
> need to surgical[l]y remove the testicle and said
> testicle will atrophy.  Since [Plaintiff] is not
> symptomatic and is [without] great pain[,] will observe
> and treat conditions conservatively. Care discussed with
> Dr. Kyerematen and Dr. Maticko and they agree to plan.
> Situation also explained to [Plaintiff] and he
> understands.  [Plaintiff] stable.

(<u>Id.</u>; <u>see also</u> Docket Entry 44-10 at 4 (setting forth P.A. Kurian's

deposition testimony confirming the accuracy of the foregoing

recitation of his handwritten note).)

The second page of Provider Progress Notes contains five

entries dated from 20:20 to 21:45 on February 21, 2013, written by

Dr. Margaret Bowen.  (<u>See</u> Docket Entry 44-2 at 2; <u>see also</u> <u>id.</u> at

3; Docket Entry 44-10 at 10.)  These entries state:

> 2020 ~~call~~ reviewed records.   [Plaintiff] [with]
> [right] testicular torsion per Dr Tharrington Cary
> Radiologist came to send [Plaintiff] out to UNC however

chart reviewed [and] states [Plaintiff] and team already aware of low blood flow to testicle. [illegible] [right] testicular torsion.

2040 ~~Spoke wit~~ paged Dr Qureshi at UNC surgery. states urological problem. call urology. [Defendant] didn't believe torsion earlier but thought ischemia. states urological emergency states send [Plaintiff] out. Note prior ? [sic] confusion and [ambiguities]. [Plaintiff] [complains of] intermittent [right] testicular pain. spoke [with] Dr. Maticko who agrees [Plaintiff] to be transfer[red] for urological evaluation.

2100 Dr McKew urologist page [illegible] through transfer center.

2140 spoke [with] Dr McKew [illegible] transfer center @ length. Dr McKew states [Plaintiff] had 2 surgeries. [Plaintiff] needs to be evaluated by surgeons. Told Dr McKew what surgery had discuss [with] me [and] radiology report Dr McKew believes [Plaintiff] to go to ED to be evaluated [and] thoroughly. [illegible] [Plaintiff]

2145 Dr Courns ED physician discuss case in detail. OK to ~~see~~ be evaluated in ED

(Docket Entry 44-2 at 2.)[7]

Finally, Plaintiff and Defendant submitted Dr. Tharrington's radiology report. (See, e.g., id. at 3; Docket Entry 52-6.) In relevant part, the report notes the "absence of appreciable intratesticular vascular flow by current imaging, raising question of ongoing or acute testicular torsion, with immediate surgical consultation and follow up urged in this regard." (Docket Entry 44-2 at 3.) Dr. Tharrington's "Impression" from this ultrasound

---

7 P.A. Kurian also confirmed the accuracy of the foregoing recitation of the 20:20 and 20:40 notes during his deposition. (See Docket Entry 44-10 at 10-12.)

includes: "1] no identifiable right intratesticular vasular flow, with immediate emergency surgical consultation and follow up therefore urged with regard to testicular torsion of unknown chronicity," and "2] abnormal but nonspecific right inguinal canal to right intrascrotal extratesticular complex-character fluid and additional material . . . . Surgical consultation and follow up recommended in this regard as well." (Id.)  The report also notes that Dr. Tharrington discussed his "[p]reliminary report of above results" via telephone with Dr. Bowen at the C.P. Emergency Room at 19:58 on February 21, 2013.  (Id.)

### D.  Defendant's Affidavit

In support of his Summary Judgment Motion, Defendant submitted a personal affidavit (Docket Entry 44-3) (the "Affidavit").  In the Affidavit, Defendant avers that the 17:30 note on February 21, 2013,

> from [P.A.] Kurian cannot be correct.  [Defendant] do[es] not recall speaking with [P.A.] Kurian on that date, and [Defendant] do[es] not believe that [Defendant] did speak with him.  There is no entry in [Plaintiff's] chart from [Defendant] regarding such a conversation, and if one had occurred [Defendant] would have charted it.  Also, [Defendant] would never advise a physician assistant that nothing should be done in such a situation.

(Id., ¶ 6.)  Based on the telephone message records from Dr. Forbach and Nurse Practitioner Randall (see id., ¶¶ 8-9), "and based on [Defendant's] memory, [Defendant] do[es] not believe that [Defendant] spoke with [P.A.] Kurian on February 21, 2013[,] as he charted in [Plaintiff's] medical records, and [Defendant] know[s]

that [Defendant] did not inform [P.A.] Kurian to take no action as he charted in [Plaintiff's] medical records" (id., ¶ 10).

Defendant also avers that he "did not treat or see [Plaintiff] on his visit to UNC Hospital on February 19, 2013." (Id., ¶ 11.) Instead, per U.N.C.M.C. medical records, "Dr. Isserlin treated [Plaintiff] on that date." (Id.) Defendant further asserts that he lacked control over (1) "where [Plaintiff] was housed or located on February 21, 2013" (id., ¶ 13), (2) the medical treatment Plaintiff received in February 2013, and (3) the transfer of Plaintiff to U.N.C.M.C. for treatment. (Id., ¶¶ 12-14.) In particular, Defendant states that,

> [b]ased on [his] review of the medical records and [his]
> understanding of how the medical treatment of inmates
> works, [he] did not have the ultimate control or
> authority over whether [Plaintiff] would be transferred
> to UNC Hospital on February 21, 2013. As an outside
> physician, the only thing that [he] could have done to
> have [Plaintiff] seen at UNC Hospital would be to make
> that recommendation to [Plaintiff's] treating physicians
> at [C.P.] Hospital. Those physicians would have then
> decided whether or not to transfer the patient to UNC
> Hospital.

(Id., ¶ 12.) Similarly, Defendant states that he "could make recommendations" regarding Plaintiff's "medical treatment in February 2013[,] . . . . but it was up to [Plaintiff's] medical providers within the prison system to determine whether or not those recommendations would be followed." (Id., ¶ 14.)

Defendant concludes the Affidavit by stating that he remains

> certain that [he] was never aware of, and never ignored,
> any substantial risk of harm to [Plaintiff] on February

17

21, 2013.  [Defendant] would never consciously disregard
any risk of harm to a patient or former patient, and [he]
never consciously disregarded any risk of harm to
[Plaintiff].

(Id., ¶ 16.)

### E.  Deposition Excerpts

In further support of the Summary Judgment Motion, Defendant
submitted excerpts from depositions of P.A. Kurian and Plaintiff.
(See Docket Entries 44-9, 44-10.)

### i.  P.A. Kurian's Deposition

P.A. Kurian testified that he did not remember making the
17:30 note on February 21, 2013.  (See Docket Entry 44-10 at 4-5.)
He similarly indicated that he did not remember the conversation
with Dr. Forbach detailed in Dr. Forbach's phone message record.
(Id. at 6.)  Nor did P.A. Kurian remember why his notes on February
21, 2013, fail to mention either the conversation with Dr. Forbach
or the telephone message from Nurse Practitioner Randall reflected
in the U.N.C.M.C. medical records.  (See id. at 5-7.)  P.A. Kurian
then engaged in the following exchange with defense counsel:

[Defense Counsel:]  Is it possible that maybe you talked
to Dr. Cory Forbach and not [Defendant], and perhaps
misunderstood what was being said?

[P.A. Kurian:]  I don't remember any people, so it could
be — anything is possible.  I don't know.  This is so
many years ago, and I don't — I don't remember anything.

[Defense Counsel:] Sure. Okay. So possibly, you never actually talked to Dr. Charles, then, correct?

[P.A. Kurian:] Possibly, yeah.

(Id. at 7.)

Based on his 17:30 note, P.A. Kurian stated that, in "a case like this, [he] probably discussed with both" Dr. Kyerematen, Plaintiff's "[p]robabl[e]" C.P. hospital doctor (id. at 9), and Dr. Maticko, the C.P. Hospital Director (id. at 8), "to get the okay from them to do what [they] were — what [P.A. Kurian] was doing" (id. at 9). According to P.A. Kurian, both Dr. Kyerematen and Dr. Maticko "could have . . . . overrule[d]" him and transferred Plaintiff to the emergency department. (Id. at 9-10.) Finally, in regard to Dr. Bowen's notes, P.A. Kurian explained that he "d[id]n't see any confusion here." (Id. at 12.) Instead, he offered this understanding of what happened on February 21, 2013, per the notes:

> [A]fter the ultrasound was done, we saw the decreased blood flow, and [P.A. Kurian] talked to . . . [Defendant]. And [P.A. Kurian] also — so [he] got the recommendation. [He] talked it over with Dr. Maticko and Kyerematen. And at that time, it was decided to go conservatively. But then . . . [P.A. Kurian is] gone. Then the patient made a complaint. And so Dr. Bowen looked at it. And she thought it was more serious or whatever. And she talked to Maticko. And they decided to send him.

(Id. at 12-13.)

## ii.  Plaintiff's Deposition

In his deposition, Plaintiff indicated that P.A. Kurian served as his "primary care provider" at C.P. hospital following his second surgery in early February 2013.  (Docket Entry 44-9 at 5.) In addition, Dr. Kyerematen and Dr. Maticko periodically checked on Plaintiff.  (Id. at 5-6.)[8]  During this time, Plaintiff "was developing a hardened mass surrounding [his] right testicle," which "was getting more painful." (Id. at 5.)  P.A. Kurian arranged for Plaintiff to receive an ultrasound and appointment at U.N.C.M.C. to "have that issue checked out" (id. at 7).  (See id. at 6-7.)  At that appointment, "[Defendant] did an 'in and out,'" but "[Plaintiff] was actually being seen by Dr. Isserlin." (Id. at 7.) In other words, "[w]hen [Defendant] came in, that was, like, a quick in and out.  It wasn't to treat [Plaintiff] specifically. [Plaintiff is] actually not sure why [Defendant] -- why he came in."  (Id.)

### F.  Expert Report

Finally, Defendant submitted the "Expert Report of Kent Kercher, MD" (Docket Entry 44-6) (the "Expert Report") and the "Affidavit of Kent Kercher, MD" (Docket Entry 44-8) (the "Expert

---

8  In response to defense counsel's questions, Plaintiff agreed that P.A. Kurian, Dr. Kyerematen, and Dr. Maticko could each have "sent [Plaintiff] to the emergency room regardless of what [Defendant] said."  (Id. at 8.)

Affidavit").[9]  According to the clinical history detailed in the
Expert Report, "[a]t approximately 15:00 on the afternoon of
February 21, a scrotal [ultrasound] was performed [on Plaintiff]
. . . with findings of a complex organizing hematoma in the right
inguinal canal and no identified blood flow to the right testicle."
(Docket Entry 44-6 at 4.)   After Plaintiff's transfer to
U.N.C.M.C.,

> [r]epeat scrotal ultrasound at 01:35 on February 22
> confirmed an 'edematous right testis and epididymis
> without evidence of internal blood flow, consistent with
> torsion.'   Urologic consultation was obtained and
> [Plaintiff] described a history of 'waxing and waning'
> scrotal swelling and pain since his hernia surgery, but
> that his pain had 'overall improved.'  While the clinical
> history was felt to be inconsistent with testicular
> torsion, the urology team recommended scrotal exploration
> in light of the ultrasound reading which suggested
> testicular torsion.

(Id.)  "During surgical re-exploration at approximately 05:00 on
February 22, intra-operative findings included:  'ischemic right
testis' with 'dense inflammatory rind surrounding the entire
spermatic cord with compressive effect' and 'no evidence of
testicular torsion.'"  (Id. at 4-5.)

---

        9   In formulating his opinions for the Expert Report, Dr.
Kercher reviewed the Complaint, Defendant's affidavit in opposition
to Plaintiff's motion for summary judgment (see Docket Entry 30-1),
and Plaintiff's medical records from the "UNC Surgery Clinic," the
"UNC Hospital," the DPS, and the "UNC Urology Clinic."  (Docket
Entry 44-6 at 2.)  The opinions he expressed in the Expert Report
"are held to a reasonable degree of medical certainty."  (Id. at
1.)  For the Expert Affidavit, Dr. Kercher additionally reviewed
Plaintiff's and P.A. Kurian's depositions.  (See Docket Entry 44-8,
¶ 3.)

In regard to Plaintiff's allegations, Dr. Kercher opines that Plaintiff's testicular ischemia "was neither predictable nor preventable" and "was the result of acute and chronic postoperative scrotal and cord edema resulting in slow, progressive compression of the blood supply to his right testicle." (Id. at 7.) More specifically, "it is [his] opinion that [Plaintiff's] testicular ischemia evolved over a period of days to weeks between the time of re-exploration on February 7 and orchiectomy on February 22." (Id. at 8.) The "'dense inflammatory rind . . . surrounding the entire spermatic cord with compressive effect'" discovered by Dr. Fifer, "along with [Plaintiff's] clinical history, suggest that the process of testicular ischemia was one that, more likely than not, slowly evolved over a period of many days and could not have been either predicted or prevented by return to the operating room several hours earlier," as "the allegations in the case [suggest]." (Id. at 8-9.)[10] Even assuming that Plaintiff "suffered from abrupt interruption of blood flow to the testicular from acute testicular torsion (which is not the case) at some point between February 7 and February 21, . . . loss of the testicle generally occurs within 6 hours of the onset of symptoms." (Id. at 9.) Thus, Dr. Kercher maintains, any "delays in care during the afternoon and evening hours of February 21, 2013," did not cause Plaintiff's testicle

_____

10    Nevertheless, Dr. Kercher deems appropriate the conservative treatment of ice, elevation, narcotic pain medication, and anti-inflammatories that Dr. Isserlin recommended on February 19, 2013. (Id. at 7-8.)

loss.  (Id.; accord Docket Entry 44-8, ¶¶ 3-5.)  In fact, Dr.

Kercher believes that, "more likely than not[, Plaintiff's]

testicle was unsalvageable at least 48 hours before the February 22

surgery."  (Docket Entry 44-6 at 7.)

Finally, as to P.A. Kurian's 17:30 note, Dr. Kercher states:

> Based upon the UNC Health Care medical records and
> the testimony of [Defendant] ([a]ffidavit dated 4/19/17),
> there is no indication that [Defendant] spoke with
> providers at the Craven Correctional Facility 2/21/13,
> nor was he aware of the results of the scrotal ultrasound
> performed on that date.  As would be standard practice,
> the ultrasound findings of possible testicular torsion
> and ischemia prompted two providers at UNC Health Care to
> recommend emergent transfer of [Plaintiff] for further
> urologic evaluation and management.  In addition to the
> clear documentation that appropriate recommendations were
> made, it is not reasonable to believe that [Defendant]
> would have made the recommendations alleged if he had
> been informed that there was potentially no blood flow to
> [Plaintiff's] right testicle.  That is, testicular
> torsion is a known surgical emergency and it is
> unreasonable to believe that [Defendant] would have
> simply recommended no further evaluation or treatment,
> had he been aware of the ultrasound results.  It is
> therefore my opinion that [Defendant] was not negligent,
> "deliberately indifferent," or wrongful in any way as
> alleged by [Plaintiff].

(Id. at 6.)

## DISCUSSION

## I.  Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  A genuine dispute of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for

the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." <u>Lewis v. Eagleton</u>, 4:08-cv-2800,

2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing <u>Barber v.</u>
<u>Hospital Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992)),
<u>aff'd</u>, 404 F. App'x 740 (4th Cir. 2010); <u>see also</u> <u>Pronin v.</u>
<u>Johnson</u>, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that
"[m]ere conclusory allegations and bare denials" or the nonmoving
party's "self-serving allegations unsupported by any corroborating
evidence" cannot defeat summary judgment).  Finally, factual
allegations in a complaint or court filing constitute evidence for
summary judgment purposes only if sworn or otherwise made under
penalty of perjury.  <u>See</u> <u>Reeves v. Hubbard</u>, No. 1:08cv721, 2011 WL
4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), <u>recommendation</u>
<u>adopted</u>, slip op. (M.D.N.C. Nov. 21, 2011).

## II.  Deliberate Indifference Standard

Courts evaluate pretrial detainees' conditions of confinement
in state custody under the Due Process Clause of the Fourteenth
Amendment.  <u>See</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979).  "The
due process rights of a pretrial detainee are at least as great as
the [E]ighth [A]mendment protections available to the convicted
prisoner." <u>Martin v. Gentile</u>, 849 F.2d 863, 870 (4th Cir. 1988).
In that regard, "when the State by the affirmative exercise of its
power so restrains an individual's liberty that it renders him
unable to care for himself, and at the same time fails to provide
for his basic human needs — *e.g.*, food, clothing, shelter, medical
care, and reasonable safety — it transgresses the substantive

limits on state action set by the Eighth Amendment and the Due Process Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989).

"Thus, deliberate indifference to the serious medical needs of a pretrial detainee violates the [D]ue [P]rocess [C]lause." Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001). Historically, the United States Court of Appeals for the Fourth Circuit has applied the same analysis to Section 1983 deliberate indifference claims under the Fourteenth Amendment as under the Eighth Amendment. See, e.g., id. at 575-77. Under that standard, Plaintiff must show that Defendant "acted with 'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).[11]

_____

[11] The United States Supreme Court recently held that an objective standard of reasonableness applies to a pretrial detainee's excessive force claim under the Due Process Clause of the Fourteenth Amendment. See Kingsley v. Hendrickson, __ U.S. __, __, 135 S. Ct. 2466, 2470 (2015). This holding calls into question whether an objective reasonableness standard applies to a pretrial detainee's claim that his medical treatment violated the Fourteenth Amendment's Due Process Clause. See, e.g., Darnell v. Pineiro, 849 F.3d 17, 30, 33, 35 (2d Cir. 2017) (concluding "that the Supreme Court's decision in Kingsley altered the standard for deliberate indifference claims under the Due Process Clause," overruling decision applying subjective standard to medical deliberate indifference claim, and holding that, in light of Kingsley, an objective standard of deliberate indifference applies in due process cases); see also Castro v. County of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (concluding that, pursuant to Kingsley, "a pretrial detainee who asserts a due process claim for failure to protect [must] prove more than negligence but less than subjective intent — something akin to reckless disregard"), cert. denied, __ U.S. __, 137 S. Ct. 831 (2017). The Fourth Circuit has

A medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). A defendant displays deliberate indifference where he possesses knowledge of the risk of harm to an inmate and knows that "his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994))).

"[D]eliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge

not yet considered whether Kingsley extends to medical deliberate indifference claims. See Mobley v. Guilford Cty. Sheriff's Office, No. 1:17cv115, 2017 WL 1409579, at *7 n.9 (M.D.N.C. Apr. 20, 2017), recommendation adopted, slip op. (M.D.N.C. May 24, 2017). However, the Court need not resolve whether an objective standard of reasonableness applies to Plaintiff's claim, for (as discussed below) consideration of the subjective prong does not alter the outcome of the Summary Judgment Motion. See, e.g., Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Florida, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (declining to consider Kingsley's implications for deliberate indifference claim because, inter alia, "regardless of whether Kingsley could be construed to have affected the standard for pretrial detainees' claims involving inadequate medical treatment due to deliberate indifference, whatever any resulting standard might be, it could not affect [the plaintiff's] case").

that harm will result." <u>Farmer</u>, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." <u>De'lonta</u>, 708 F.3d at 525 (internal quotation marks omitted). A plaintiff can satisfy this standard by showing "'that a [defendant] knew of a substantial risk from the very fact that the risk was obvious.'" <u>Scinto</u>, 841 F.3d at 226 (quoting <u>Makdessi v. Fields</u>, 789 F.3d 126, 133 (4th Cir. 2015)).

A plaintiff can also establish "a prima face case of deliberate indifference" where "'a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it.'" <u>Id.</u> (brackets and ellipsis in original) (quoting <u>Parrish ex rel. Lee v. Cleveland</u>, 372 F.3d 294, 303 (4th Cir. 2004)). In addition, "'[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.'" <u>Id.</u> (brackets in original) (quoting <u>Miltier v. Beorn</u>, 896 F.2d 848, 853 (4th Cir. 1990), <u>overruled in part on other grounds by</u> <u>Farmer</u>, 511 U.S. at 837). Finally, "a significant delay in the treatment of a serious medical condition may, in the proper circumstances," constitute deliberate indifference. <u>Webb v. Hamidullah</u>, 281 F. App'x 159, 166 (4th Cir. 2008). "A[ constitutional] violation only

occurs, however, if the delay results in some substantial harm to the patient. Thus, in order to defeat summary judgment on the delay issue, [a plaintiff i]s obligated to establish that the delay in his [treatment] caused him substantial harm . . . ." Id. at 166-67 (footnote omitted); see also Wynn v. Mundo, 367 F. Supp. 2d 832, 838 (M.D.N.C.) ("[T]his court is persuaded that delay in the receipt of medical care only constitutes deliberate indifference where the plaintiff can show that the delay caused substantial harm.") (collecting cases), aff'd, 142 F. App'x 193 (4th Cir. 2005).

### III. Analysis

Defendant urges the grant of summary judgment in his favor on three grounds. (See Docket Entry 44 at 5.) First, Defendant contends that "Plaintiff cannot show that Defendant was aware of a risk of serious harm to . . . Plaintiff when . . . Defendant was allegedly consulted." (Id.) Second, Defendant maintains that "Plaintiff cannot show that Defendant controlled . . . Plaintiff's medical treatment (i.e. that he acted personally in the deprivation of Plaintiff's rights) at the time of Defendant's alleged deliberate indifference." (Id.) Third, Defendant asserts that "Plaintiff cannot show that he suffered any harm from the delay allegedly caused by Defendant's conduct." (Id.) Only that third contention entitles him to summary judgment.

## A.  Subjective Awareness Contention

Defendant maintains that "Plaintiff has and can produce no evidence showing that [Defendant] subjectively knew that Plaintiff was in any danger on February 21, 2013."  (Id. at 17.)   In Defendant's view, "[a]t most, and in the light most favorable to . . . Plaintiff, Plaintiff's evidence shows only that, perhaps, a misunderstanding occurred."  (Id. at 16.)   The Court should not grant summary judgment based on that argument.

In that regard, viewed in the light most favorable to Plaintiff, evidence (in the form of P.A. Kurian's notes) would support a finding that, between 15:00 and 17:30 on February 21, 2013, P.A. Kurian informed Defendant of the absence of bloodflow to Plaintiff's testicle.  (See Docket Entry 44-2 at 1; Docket Entry 44-6 at 4.)[12] Further, per its records, U.N.C.M.C. lacked knowledge of this bloodflow problem prior to February 21, 2013.  (See Docket Entry 44-1 at 9-10 (stating that, at the time of his second surgery, the "[u]ltrasound did show good [blood]flow to the testes"); Docket Entry 44-5 at 3 (noting that constrained bloodflow "findings are new"); see also Docket Entry 44-4 at 1-2 (containing no mention of bloodflow problems at appointment on February 19,

_____

12  Substantial doubt exists as to the reliability of that evidence.  (See Docket Entry 44-10 at 14 (documenting P.A. Kurian's acknowledgment that he may not have spoken to Defendant on February 21, 2013).)  At this juncture, however, the Court must view the evidence in the light most favorable to Plaintiff.  See Henry, 652 F.3d at 531.

2013).)  A reasonable factfinder could deem "[t]he inappropriateness of" a doctor counseling against further treatment when informed of the onset of such bloodflow issues "obvious, and [such a finding of] obviousness could support a factfinder's conclusion that" Defendant knew his proposed treatment plan "was inadequate" to mitigate the risk to Plaintiff.  <u>Heyer v. United States Bureau of Prisons</u>, 849 F.3d 202, 211-12 (4th Cir. 2017); <u>see also</u> <u>Farmer</u>, 511 U.S. at 842 ("Whether a [defendant] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and <u>a factfinder may conclude that a [defendant] knew of a substantial risk from the very fact that the risk was obvious</u>." (emphasis added; citation omitted)).

Indeed, even Defendant acknowledges the obvious inadequacy of the instructions attributed to him.  (<u>See</u> Docket Entry 44-3, ¶ 6 ("I would never advise a physician assistant that nothing should be done in such a situation."); <u>see also</u> Docket Entry 44-6 at 6 (setting forth Defendant's expert's opinion that "testicular torsion is a known surgical emergency" and concluding that recommendation of "no further evaluation or treatment" in response to such a report represented such an unreasonable course of action that Defendant must not have acted in that fashion).)  Under the circumstances, a factfinder reasonably could conclude that Defendant subjectively knew of (and disregarded) the substantial

risk of harm to Plaintiff's health posed by his compromised testicular bloodflow on February 21, 2013. See Heyer, 849 F.3d at 211-12. The Court therefore should not grant summary judgment based on Defendant's subjective knowledge argument.

### B. Control Contention

Relying on the decisions in Parrish, 372 F.3d 294, and Pronin, 628 F. App'x 160, Defendant next seeks summary judgment on the theory that "Defendant did not control Plaintiff's medical care on February 21, 2013" (id. at 15). More specifically, Defendant asserts that he "did not determine whether Plaintiff would be transferred to an outside facility" on that date (id. at 14), as C.P. medical personnel "were free to transfer . . . Plaintiff to an outside emergency department whenever they chose to do so" and "would have their own independent duty to transfer . . . Plaintiff if necessary" (id. at 15). This contention misses the mark.

To begin, neither cited decision supports Defendant's proposition. In the first, four police officers "agreed . . . that the use of [a spit] mask [on a pretrial detainee] was warranted," Parrish, 372 F.3d at 298, and subsequently "decided that [one officer] should transport [the detainee] to the adult detention center," id. at 299. The officers placed the detainee in the transport van, where he vomited into the spit mask and suffered fatal "'aspiration and positional asphyxia'" while en route to the detention center. See id. at 300. The Fourth Circuit affirmed the

award of summary judgment to a fifth officer, who took no part in the decision to use the spit mask, see id. at 298, and "had left the police station" before "the officers decided to transport [the detainee] to the Adult Detention Center," which, the Fourth Circuit noted, constituted "the decision that created the risk of harm to [the detainee]," id. at 302 n.9. Here, by contrast, when viewed in the light most favorable to Plaintiff, the evidence would permit a finding that "the decision that created the risk of harm to [Plaintiff]," id., namely, to forego treatment for the lack of testicular bloodflow on February 21, 2013, arose from Defendant's recommendation (see Docket Entry 44-2 at 1).

The second cited case involved an inmate's claim that a doctor's "delay of more than a year" in prescribing epilepsy medication, which "delay [allegedly] resulted in a seizure," constituted deliberate indifference. Pronin, 628 F. App'x at 163.[13] That inmate "was seen 44 times in 16 months for various medical reasons" by multiple medical officials. See Pronin v. Johnson, No. 5:12-cv-3416, 2015 WL 1518380, at *7 (D.S.C. Mar. 31, 2015), aff'd in part, vacated in part, and remanded, 628 F. App'x 160 (4th Cir. 2015). The relevant doctor (Dr. Blocker) apparently saw the inmate on only two of those occasions, specifically on January 18, 2012,

_____

13 "Pronin was treated for seizure-like symptoms on February 16, 2013, February 22, 2013, and March 26, 2013." Pronin v. Johnson, No. 5:12-cv-3416, 2015 WL 1518380, at *7 (D.S.C. Mar. 31, 2015), aff'd in part, vacated in part, and remanded, 628 F. App'x 160 (4th Cir. 2015). The defendant prescribed epilepsy medication on February 22, 2013. Id.

and February 22, 2013.  See id.  In affirming the grant of summary

judgment to Dr. Blocker, the Fourth Circuit stated:

> It is undisputed that, when Pronin arrived at the
> institution, he was not on any seizure medication, and he
> gave conflicting accounts as to his seizure history.
> Pronin submitted no evidence to support his allegations
> that he suffered and complained of seizure-like activity
> after his arrival at the institution and prior to his
> alleged seizure in February 2013, and he presents only
> conclusory statements and no details regarding his
> alleged attempts to obtain medical treatment for his
> seizure symptoms prior to this date.  Moreover, his
> grievances and medical records do not support his
> allegations, and while he requested seizure medication,
> there is no evidence that he complained of seizure-like
> activity prior to the actual seizure.  Further, Pronin's
> assertions that he suffered grave injury from his seizure
> are not supported by the record.  Finally, Pronin does
> not dispute Blocker's statements that, for a substantial
> portion of the time Pronin contends he was being
> deliberately indifferent, Blocker was actually either on
> medical leave or not the first line of medical treatment
> for Pronin.  Based on the foregoing, we find that Pronin
> has failed to raise a material issue of fact as to
> whether Blocker was deliberately indifferent to a serious
> medical need.

Pronin, 628 F. App'x at 164.  Those considerations do not apply in

any comparable way in this case.

Ultimately, Defendant asserts that, because he lacked power to

force C.P. personnel to transfer Plaintiff to an outside hospital,

his alleged advice to C.P. personnel not to transfer Plaintiff to

an outside hospital for further treatment falls short of deliberate

indifference as a matter of law.  (See Docket Entry 44 at 12-15.)

However, the relevant question remains not whether Defendant

possessed authority to compel C.P. personnel to transfer Plaintiff

for surgical intervention, but whether Defendant's purported

directive against pursuing such treatment disregarded a substantial risk of harm to Plaintiff. Accordingly, the Court should not grant Defendant summary judgment on this ground.

### C. Substantial Harm Contention

Finally, Defendant seeks summary judgment due to the lack of competent evidence that Defendant's alleged conduct harmed Plaintiff. (See Docket Entry 44 at 9-12.) In particular, Defendant maintains that, "even if Defendant had acted with some culpability, which is denied, that culpability could have only caused a 3 hour and 10 minute delay in Plaintiff's transfer to the hospital." (Id. at 11.)[14] Defendant further asserts that Plaintiff failed to prove that this delay in treatment caused him substantial harm, rendering summary judgment appropriate. (Id. at 12 ("Because . . . Plaintiff has designated no experts and has no evidence to show that the 3 hour and 10 minute delay resulted in substantial harm, he cannot avoid summary judgment on this issue, and summary judgment should be granted for Defendant.").)

The Complaint asserts that Defendant displayed deliberate indifference to Plaintiff's "serious medical need by failing to initiate action when he first knew of the lack of or decreased blood flow and possible impending loss of [Plaintiff's] testicle

_____

14 This three-hour-and-ten-minute figure represents the time elapsed between P.A. Kurian's 17:30 note on February 21, 2013, and Dr. Bowen's 20:40 note indicating that "the decision had been made to transfer . . . Plaintiff for a urological evaluation." (Id.)

and by counseling against tak[i]ng any preventative action to prevent its loss." (Docket Entry 2 at 6.) In other words, Plaintiff claims that Defendant's (1) failure to take action regarding Plaintiff's testicular bloodflow issue "when he first knew of the lack of or decreased blood flow" (id.) and (2) his recommendation against treatment on February 21, 2013, delayed Plaintiff's receipt of necessary medical care.

"[A] significant delay in the treatment of a serious medical condition may, in the proper circumstances, indicate a[ constitutional] violation." Webb, 281 F. App'x at 166. Yet "delay in the receipt of medical care only constitutes deliberate indifference where the plaintiff can show that the delay caused substantial harm." Wynn, 367 F. Supp. 2d at 838 (collecting cases); see also Webb, 281 F. App'x 166-67 ("A[ constitutional] violation only occurs, however, if the delay results in some substantial harm to the patient. Thus, in order to defeat summary judgment on the delay issue, [the plaintiff] was obligated to establish that the delay in his surgery caused him substantial harm . . . ." (footnote omitted)); Martin, 849 F.2d at 871 ("There is no suggestion that the delay in taking [a pretrial detainee] to the hospital exacerbated his injuries in any way . . . . Under these circumstances, we conclude that the delay in taking [the pretrial detainee] to the hospital, even if deliberate, did not amount to a

constitutional violation under the *Estelle* standard."). Plaintiff has not raised a genuine factual dispute on this material point.

As an initial matter (and as shown by the review of the record in Section II), Plaintiff produced no evidence from which a factfinder could ascertain "when," prior to the alleged call with P.A. Kurian on February 21, 2013, Defendant "first knew of the lack of or decreased [testicular] blood flow" (Docket Entry 2 at 6). Therefore any finding that such delay caused Plaintiff harm "would necessarily be based on speculation and conjecture," rendering summary judgment proper on this aspect of Plaintiff's deliberate indifference claim. <u>Matherly v. Andrews</u>, 859 F.3d 264, 280 (4th Cir.) (internal quotation marks omitted), <u>cert. denied</u>, __ U.S. __, 138 S. Ct. 399 (2017).

In regard to the delay on February 21, 2013, Defendant produced expert testimony that, "more likely than not[, Plaintiff's] testicle was unsalvageable at least 48 hours before the February 22 surgery." (Docket Entry 44-6 at 7.) Defendant's expert further opined that, "to a reasonable degree of medical certainty . . . a 3 hour and 10 minute delay in [Plaintiff's] transfer to an outside hospital on February 21, 2013[,] had no impact on [Plaintiff's] outcome" and "would have caused no medical harm to [Plaintiff]." (Docket Entry 44-8, ¶¶ 4-5; <u>see also</u> Docket Entry 44-6 at 8-9 (stating "that the process of testicular ischemia was one that, more likely than not, slowly evolved over a period of

many days and could not have been either predicted or prevented by return to the operating room several hours earlier").) In response to the Expert Report and Expert Affidavit (again, as documented in Section II), Plaintiff produced no evidence of harm attributable to any delay in treatment on February 21, 2013. Instead, he asserts that "[t]he degree of medical certainty of this matter is an issue for a jury to decide." (Docket Entry 54 at 4.) In the absence of evidence showing substantial harm from the alleged delay on February 21, 2013, however, Plaintiff's deliberate indifference claim fails as a matter of law. See, e.g., Webb, 281 F. App'x at 167 (affirming summary judgment award where the plaintiff failed to prove substantial harm from the alleged "improper delay"); Lewis, 2010 WL 755636, at *8-9 (granting summary judgment on Section 1983 "medical indifference" claim where "[t]here is no competent evidence in the record to show the delay. . . caused any harm"); Wynn, 367 F. Supp. 2d at 838-39 (awarding summary judgment to the defendants where the record showed "the delay . . . [was] the cause of no substantial harm").[15]

---

15    In his Response and Reply, Plaintiff attempts to recalibrate his deliberate indifference claim, contending that Defendant's treatment of Plaintiff throughout January 2013 and February 2013 amounted to deliberate indifference. (See Docket Entries 52, 54.) In particular, Plaintiff points to Defendant's "'conservative approach' method of treatment" (Docket Entry 52 at 11) and his decision to allow Dr. Isserlin to treat Plaintiff on February 19, 2013 (see id. at 5-6; Docket Entry 54 at 2-3). Plaintiff's effort in this regard cannot stave off summary judgment. Most fundamentally, the allegations in the Response and Reply do not constitute proper evidence for summary judgment purposes, as Plaintiff did not make them under oath or penalty of

Accordingly, the Court should grant Defendant summary judgment.

**CONCLUSION**

Defendant has shown entitlement to judgment as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 43) be granted.

This 7th day of February, 2018.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

---

perjury (see Docket Entry 52 at 15; Docket Entry 54 at 5). See Reeves, 2011 WL 4499099, at *5 n.14. Additionally, many of the allegations upon which Plaintiff relies qualify as speculative and/or conclusory. (See, e.g., Docket Entry 52 at 5 (asserting, regarding the second surgery, that "Plaintiff can only assume he was misled at [D]efendants instructions"), 6 ("Plaintiff would assert that if a further and proper exam was performed by [Defendant on February 19, 2013,] then the dense inflamitory [sic] rind surrounding Plaintiffs testicle with compressive effect could have been taken care of and he might still have his right testicle.").) As such, they cannot defeat summary judgment. See, e.g., Matherly, 859 F.3d at 279-80.